Our fourth argument of the morning is in Appeal No. 2314-28, Chad Sherman v. Acting Commissioner of Social Security. Mr. Forbes, good morning. Hopefully I don't have too much weight here. Paperweight, that is. My name is Randall Forbes. I represent the Disability Claimant. Maybe to narrow the issues, if the Tutwiler case has narrowed the holding of the Arnett case in relation to what is preserved from the District Court to here, then the only arguments that would be left would be the frequent urination argument and the fatigue, sleepiness, and napping argument. Do you agree that Tutwiler has narrowed it? You didn't have the opportunity to respond to the Commissioner's 20HA letter. Now is your chance, if you want to. Well, our firm did the Tutwiler case, so we were quite familiar with it. I mean, I think it does narrow. Arnett was a nice case to have as long as it lasted. It sounds like you agree. Yeah. I mean, when the Arnett opinion came down, it was a surprise to us and kind of a gift, and it didn't surprise us also that it was narrowed. And then there's no question, is there, that in the District, as a matter of just the record in this particular case, there's a series of arguments that are pressed in the blue brief that your colleague filed. Right. They were not raised in the District Court. We definitively were not raised. Not specifically, only in the general RFC way, which would have passed muster under Arnett but not under the new case of Tutwiler. Okay. I appreciate your candor. Yep. So the finding below that we are challenging is actually an implicit finding, and that is that more likely than not, the limitations related to hourly urination and a daily nap should not be included in the RFC. That is the implicit finding made by the ALJ that we're challenging. And the reason I put it in those terms is because at the ALJ level, the first determination in order to get to a finding is, does the evidence more likely than not support the finding? So if that's the implicit finding, and in our formulation of the issue, we are talking about we're accepting that maybe these are non-severe impairments, although I can make an argument that they're severe. But even the non-severe impairments have limitations when added to all the other limitations can result in a work-preclusive situation. So this is the finding that has to be supported by substantial evidence in order to pass scrutiny on appeal. And that finding, again, is that there's no need for any additional express limitation to accommodate the fatigue or the hourly urination. Correct. So somehow or another, you have to be able to look at the ALJ decision and trace how that ALJ looked at this issue to get to the finding that it preponderates in excluding these limitations from the RFC. You weren't asking for a specific limitation for either of those conditions, were you? It seemed to me you were arguing that those two conditions made him unemployable. Well, the limitation is this. If the on-task expectation is 10% or 15% and the need for the breaks exceeds those expectations, then what we have is a work-preclusive limitation related to the on-task expectation. I think that's the crux of it right there, and I'm thankful you said that. Because why couldn't this light work, he could be off-task up to about five minutes an hour? It depends on which vocational testimony in the record you accept, because there are several hearings and each vocational expert that testifies Go with the most recent. That would be 10 minutes an hour. Why during a 10-minute period could Mr. Sherman not use the restroom? It's possible, I suppose. The second step of this is that although you're allowed the equivalent of 10 minutes an hour, if you have to do it 10 minutes an hour like clockwork throughout a day, then that's in and of itself disruptive. But the reason that these two issues, napping and urination, are coupled is so that and I'm the one who did the district court brief. I coupled them precisely because I saw what you were saying. Oh, what if he can't make it 10 minutes an hour? In other words, what if 10 minutes an hour was sufficient for him to do what he needed to do? I mean, that's a point. Obviously, if he has an hour nap, then it doesn't matter if the urination trips are nine minutes, the hour nap in the afternoon knocks him way over the limit. What evidence do we have in the record that he needed to nap during the workday? The disruption of his sleep from the frequent urination problems and the taking of the heavy-duty medications to address pain, which probably were necessary to get him to the light level of work in the first place. I believe, and although this is more of an ethereal point, most cancer treatment survivors, especially radiation and chemo survivors, just in general get tired even though they're alive. What do we do on the fatigue point with his conflicting testimony in the record? Because at times he says he does get fatigued, but at times he denies it. Well, if the judge does a good job, well, it's going to fluctuate. I mean, there are just different medical problems that wax and wane, and that's going to show up in the medical records. The urination waxes and wanes. But I don't think there's anything about fatigue that shows up in the medical records. It was all from his testimony, which was inconsistent. Unless I'm missing something, please tell me. No, I believe if someone's on opioids or on gabapentin or those heavy-duty pain meds, that's just an inference that has a sound evidentiary basis. But there's nothing in that. We'll give you a couple minutes. There's nothing in the medical evidence where he raised with one of his, for example, the prescribing provider, hey, look, this stuff's knocking me down. You know, I have to nap, you know, midday. Is there anything we can do to cut the fatigue? I don't know that that's—I haven't found something like that, except that in his case we are not just talking one area of the body like back pain. No, no, no, I know. We're talking multiple areas of pain and multiple medications. He's probably just happy to have the pain go away. I mean, yeah. Okay. You want to save your time? I do, but I want to say this before I sit down. Go ahead. Sure. The hydrochlorothiazide is connected to the hypertension. It's designed to make a person frequently urinate to address swelling with high blood pressure. The Flomax is also designed to assist urination that has been instructed by the prostate. He's on both of these medications, and so almost— there's an overlapping period, but it's almost throughout. So those were not even mentioned in the ALJ decision. Benign prostate hypertrophy or prostate problems were not mentioned in the ALJ decision. If there's going to be a weighing, it needs to be mentioned. Okay. We'll see you in a couple minutes here. Ms. Valerio, good morning. Good morning. May it please the Court. Christina Valerio on behalf of the Acting Commissioner of Social Security. Mr. Sherman asked this Court to re-weigh the evidence, but here the administrative law judge considered the mixed evidence in this case and provided a reasoned analysis that is supported by substantial evidence. Thus, this Court should affirm the ALJ's decision. I would like to discuss the two preserved issues today, Mr. Sherman's urinary frequency and his alleged need to nap during the day. First, Mr. Sherman has failed to prove greater limitations were required in light of his urinary frequency complaints. Throughout the relevant time period, Mr. Sherman sometimes complained of urinary frequency and often denied it. The ALJ reasonably considered this mixed evidence. She discussed Mr. Sherman's testimony that he needed to urinate every hour and compared it to the objective evidence in the record. After Mr. Sherman had not been seen by a medical provider or taken any urinary medication for at least two years, his doctor restarted the same medication he had been on in the past and noted no changes in symptoms or changes in the course of treatment. Mr. Sherman failed to return for follow-up urology appointments at least four times during the relevant period. The record shows multiple denials of frequency. The last time that we see Mr. Sherman complain of urinary frequency, he was given a new urinary medication and his doctor told him, if there is a problem, come back. We don't see any instance of him returning to his doctor with complaints. This evidence does not align with Mr. Sherman's testimony that he needed to urinate nonstop throughout the day since his bladder cancer surgery or that he needed to go five to six times per night or that he needed to go multiple times per hour. Is that actually what he testified to? I thought he said I have to use the restroom once an hour or at least once an hour but not four or five times an hour? Your Honor, there's mixed testimony. He testifies that he has to go five to six times during the night. Right, right. He testifies nonstop throughout the day for the last eight or nine years and that's the most inconsistent testimony with the record. And then he also testifies, well, I got up at 6 o'clock this morning and now it's 1 p.m. I've gone about once per hour, and that is the testimony that the ALJ cites to in the discussion, in this decision. Okay, yeah. I mean, I think that's, I mean, I'm not trying to be hyper-technical, but somebody saying I have to go to the bathroom five or six times an hour is a lot different than once per hour when he can be off task for five to ten minutes. Yes, Your Honor. I apologize if you heard me say five to six times per hour. I meant five to six times per night. Okay, yeah. But, you know, a night could be six or eight or ten hours long. Yes, and once per hour. And as you pointed out, that's not necessarily inconsistent with the RFC here for light work. The vocational expert testified that Mr. Sherman could be off task 15% or that he needed to work 50 minutes out of every hour. And here, that gives Mr. Sherman 10 minutes per hour to go and use the restroom. It also provides him with 15-minute breaks every two hours, generally, and a half-hour lunch break to use the restroom. So Mr. Sherman's testimony that he needs to urinate once per hour is not inconsistent with the residual functional capacity assessment. If you could turn to the fatigue issue, please. The ALJ did not acknowledge that. What are we to do with that? Your Honor, the ALJ does not specifically say fatigue or need to nap. The ALJ does acknowledge contrary evidence, such as Mr. Sherman's medical provider noting that he remains active. He goes mushroom hunting, fishing, does some volunteer work, but remains active is the quote, and not a quote you would intend to see from a medical provider with someone that was experiencing extreme fatigue. Mr. Sherman may have taken a daily nap, but there's no evidence showing that he needed to take a daily nap. We don't have a medical doctor opining that he needed to take a nap, and we don't have anyone noting severe fatigue needs to nap, something along those lines. Also, Mr. Sherman argues that his need to nap and his fatigue or sleepiness were the cause of him taking hydrocodone, an opioid. But we see through the record that Mr. Sherman did not regularly take this drug. At the time that he alleges he became disabled, the treatment notes indicate that he had not been taking any medications or seeing any providers except for gabapentin for two years. So he was not taking hydrocodone at the time of his alleged disability.  Correct, Your Honor. Yeah, okay. All right. Yeah, not to prevent drowsiness. In other words, it likely worked the other direction. Correct, Your Honor. Yeah. At the administrative hearing, Mr. Sherman also testified that he was only taking Aleve and aspirin for his pain. His medical providers would not prescribe opioids at that time. So at the time of the administrative law judge's decision, Mr. Sherman was not taking opioids, and that is seen at the ALJ's decision at page 1,164 and in the record at pages 1,224. Because Mr. Sherman was not taking hydrocodone for a significant portion of the relevant period, including at the time of the ALJ's decision, he could not have been experiencing any side effects from this drug. Moreover, the ALJ considered Mr. Sherman's testimony, I don't take anything that makes me drowsy. The ALJ cited two records where there is reports of Mr. Sherman denying fatigue, one record. There were reports in the record that Mr. Sherman's medications did not cause side effects, and as I discussed, his medical providers stated that he remained active. All of this evidence reasonably led the ALJ to conclude that no RFC limitation for napping or for significant urinary frequency was required. Ultimately, it was Mr. Sherman's burden to establish these limitations. He has not met that burden. Therefore, the commissioner requests that the court affirm the ALJ's decision. Thank you. Thank you, Ms. Valerio. Mr. Forbes. The daily activities, testimony, and finding are mentioned in the ALJ decision is distorted. If you'll search mushroom in the record, mushroom hunting, you'll find that he said, well, that it was difficult for him. He got chest pain doing it. If you'll look at everything on the list of daily activities, none of that is inconsistent with taking a nap or frequent urination, not even golf. Heck, golf these days is arranged for old guys like me, 63-year-olds, who can't make it around the course without a little extra help. It's not even inconsistent with golf. So that's a point I wanted to bring up about the DALs. This is a veteran. He's a consistent worker, maybe not a stellar worker, but he's a consistent worker. He's a cancer survivor. Yeah, you can nitpick and find some places in the record where he might not have gotten to every appointment. But this ALJ took the only issue that would put him over the top and essentially ignored it. And the ALJ didn't make any findings. I might be wrong on this, but I don't think the ALJ made any findings as to the on-task testimony of the vocational expert or the on-task testimony in previous hearings and then tried to reconcile them. So thank you, Your Honor. You're quite welcome, Mr. Forbes. Thanks to you. Ms. Valerio, thanks to you. We'll take the appeal under advisement.